FIDELITY TRUST COMPANY, receiver,

*v.*

FEDERAL TRUST COMPANY et al.

[Decided March 26th, 1917.]

1. Where moneys were loaned by one corporation to an individual and by him loaned to another corporation, which mingled them with other moneys so that their identity was completely lost, the receiver of the first corporation cannot proceed against the receiver of the second corporation, both being insolvent, on the ground that such moneys were trust funds, since, unless the fund can be identified, such action will not lie.

2. In such case the receiver of the first corporation takes such claim in the right of the individual as he finds it, subject to the fact that it has been satisfied in whole or in part, and to any rights of estoppel.

3. In such case the receiver of the first corporation cannot proceed against the receiver of the second corporation for money had and received.

4. The second corporation is not charged with knowledge that the moneys it received from the individual did not properly come into his possession, although the individual was an officer and stockholder in both corporations.

5. The proposal of the individual as president of the second corporation for liquidation of the loan by issuance of stock or bonds amounted to an offer on his part to receive such securities in liquidation of the loan, and the action of the directors and stockholders thereon, authorizing the issuance of the stock and bonds for such purpose, amounted to an acceptance of this offer.

6. The net proceeds of these securities should be credited against the claim of the assignee of the individual as it existed at the time of the approval of the issue of these securities by the stockholders of the company.

7. Where such bonds indicate on their face that they were intended to be secured by a mortgage, and both parties dealt with them on that assumption, the assignee of the creditor is estopped from asserting the invalidity of the mortgage because of its improper record.

8. As against those claiming in the right of the individual president the stock will be considered as issued, where it appears that the intent was that it should be, and the parties acted as if it were, although in fact no certificates were issued.

9. One claiming in the right of an individual, who has negotiated for his own benefit bonds which indicate on their face that they were intended to be secured by a mortgage on chattels, is estopped from asserting as a creditor of the mortgagor that the mortgage is invalid because of improper record.

On bill, &c.

*Mr. Francis Lafferty,* for the complainant.

*Mr. Louis Hood,* for the assignee, James Smith, Jr.

*Mr. Hugh B. Reed,* for the receiver, J. H. Halsey & Smith.

*Messrs. Pitney, Hardin & Skinner* (*Mr. Hardin*) and *Mr. Frank H. Sommer,* for the Federal Trust Company and Mechanics and Metals National Bank.

*Messrs. Wolber & Blake,* for the American National Bank.

LANE, V. C. (after submission of briefs).

*First.* Does the relationship of creditor and debtor exist as between J. H. Halsey & Smith and the Newark Advertiser Company? I have not changed my mind that the original intent was that J. H. Halsey & Smith should advance the moneys that it did to James Smith, Jr., and that James Smith, Jr., should advance them to the Newark Advertiser Company, and that no express contract relation existed between the two corporations. It is now said that the relation of creditor and debtor exists by reason of the fact that J. H. Halsey & Smith was without au-

thority to make the loans to James Smith, Jr.; that the loans were made for the benefit of the Newark Advertiser Company, and the Newark Advertiser Company having received the benefit of the trust fund became a debtor of J. H. Halsey & Smith. The legal theories upon which these contentions are predicated are the right to follow trust funds and the right to sue for moneys in the possession of one, legally or equitably, belonging to another, as for money had and received. The difficulty with the trust fund theory is that there is no trust fund in the possession of the Newark Advertiser Company to follow which can be identified; the moneys advanced by James Smith, Jr., to the Newark Advertiser Company have been commingled with other moneys and their identity completely lost; they are not represented by investments in property. Unless the trust fund can be in some way identified, as I read the cases, there can be no relief on this theory. *Shaler* v. *Trowbridge, 28 N. J. Eq. 595; Ferry* v. *Laible, 31 N. J. Eq. 566; reversed, Laible* v. *Ferry, 32 N. J. Eq. 791; Standish* v. *Babcock, 52 N. J. Eq. 628; Ellicott* v. *Kuhl, 60 N. J. Eq. 333,* in which Magie, ordinary, said:

"It is now a well-settled doctrine that the *cestui que trust* who can trace the trust funds into a particular property may assert a right to that property and its proceeds, if sold, if the proceeds remain traceable, and are found in the hands of those who can assert no better right thereto." *First National Bank of Freehold* v. *Thompson, 61 N. J. Eq. 188; Bohle* v. *Hasselbrock, 64 N. J. Eq. 334; James* v. *Aller, 66 N. J. Eq. 69.* Under the circumstances, therefore, the trust *res,* if any exist, is the claim of James Smith, Jr., against the Newark Advertiser Company, or his interest in that company as holder of the increased stock hereafter noticed. If this is the sole trust *res,* then the receiver of J. H. Halsey & Smith is bound to take the claim in the position that he finds it. If it had been satisfied, in whole or in part, or if there is an estoppel existing in favor of particular rights, the receiver takes the claim subject to these.

The right to sue for money had and received is predicated upon the broad rule expressed by the supreme court in *Spengeman* v. *Palestine Building Association of Hudson County, 60 N. J. Law 357:*

"Where the defendant has received money from a third person, even though he received it under a claim of title to it in opposition to the plaintiff's right, yet if he had by law authority to receive it from such third person, and in equity the plaintiff ought to have it, this count for money had and received can be sustained."

But the circumstances of that case and this are entirely different. There the defendant, a real estate agent and officer of the plaintiff corporation, agreed with the corporation that if it would purchase Tompkins' land he would allow his commission to the association and thus reduce the price. Relying on this agreement the association bought the land at the price of $8,-750, paid that sum to Tompkins, who thereupon paid part of it to the defendant. The statement of facts, I think, indicates the inapplicability of the case to the conditions existing in the one at bar.

It is unquestioned that J. H. Halsey & Smith had no authority to make the loans it did to James Smith, Jr. *Earle v. American Sugar Refining Co., 74 N. J. Eq. 751* (at *p. 762*). It might, however, have legitimately paid these sums of money to James Smith, Jr., for James Smith, Jr., might have loaned money to J. H. Halsey & Smith, and the moneys advanced by J. H. Halsey & Smith might have been repayments. As matter of fact, when the moneys were first advanced there was a credit balance on the books of J. H. Halsey & Smith in favor of James Smith, Jr. The Newark Advertiser Company is not charged with knowledge that the moneys it received from James Smith, Jr., or from J. H. Halsey & Smith on account of James Smith, Jr., did not properly come into his possession. *First National Bank v. Christopher, 40 N. J. Law 435.* My view is that in this complicated situation the two corporations dealing must be treated as separate and distinct, and as if there were really three parties dealing, entirely unconnected, to wit, J. H. Halsey & Smith, James Smith, Jr., and the Newark Advertiser Company. By this manner of treatment only do I think a result can be arrived at which will be equitable to the creditors of the two insolvent corporations. The Newark Advertiser Company had power to borrow money from James Smith, Jr., and James

Smith, Jr., might, of course, advance moneys to it. It did so borrow moneys and was enabled thereby to continue business and incur liabilities. Its creditors must be assumed to have believed the moneys so advanced were being advanced by James Smith, Jr., the sole substantial stockholder of the Newark Advertiser Company. It is conceivable that if they had understood moneys were being advanced by outsiders they would have acted in an entirely different way. Balancing the equities of the creditors of J. H. Halsey & Smith, and the Newark Advertiser Company, I think that the strict rule of law should be applied; that the statute forbids the advance of money by a corporation to its officers and directors, I do not think alters the situation, for the only effect would be to permit J. H. Halsey & Smith to proceed against the Newark Advertiser Company either upon the trust theory or for money had and received, which I hold cannot be done. I do not think that the statute in any way enlarges the rights of J. H. Halsey & Smith as against the Newark Advertiser Company. I conclude, therefore, that any claim that the receiver of J. H. Halsey & Smith may have against the assets of the Newark Advertiser Company must be based upon subrogation to the claim of the assignee of James Smith, Jr., and is subject to the condition of that claim as it now exists. Whether there is such subrogation I have not determined, as it has not been urged.

*Second.* Must there be credited against any claim of the assignee of James Smith, Jr.—(1) the proceeds of a bond issue of $500,000 other than that used to take up a prior issue of bonds; (2) the amount of the increase of capital stock, $400,-000, authorized at a meeting of the stockholders June 22d, 1912, at the same time the bonds were directed to be issued; (3) the increase of the capital stock $800,000 authorized at a meeting of the board of directors December 28th, 1914?

The bonds were actually delivered to James Smith, Jr., and the $100,000 of the prior bond issue surrendered. The bonds were then used by James Smith, Jr., as will hereafter appear. It is conceded that to the extent of the difference between the amount due upon the $100,000 of bonds surrendered and the

$500,000, there must be a credit on the James Smith, Jr., claim. At a meeting of the directors of the corporation, June 19th, 1912, at which James Smith, Jr., was present, he, as president, called attention to the fact of the indebtedness of the company on the outstanding issue of $100,000 of bonds, and for moneys loaned to it and on open account, and it was then determined "for the purpose of refunding the said bonds and of enabling the company to reduce its other indebtedness and secure additional working capital," the company should make a new bond issue of $500,000, secured by a mortgage upon all of its franchises and property, and also increase its capital stock to $500,000. The resolution further provided, in respect to the capital stock, that as soon as it had been increased the officers were authorized to issue and sell any or all of it, and also to use it or any part of it in satisfaction or liquidation of any part of the indebtedness of the company, at not less than the par value. At a stockholders' meeting—and it must be kept in mind that James Smith, Jr., was really the sole stockholder—the recommendations of the directors were adopted; steps necessary to effect the bond issue and to increase the stock were then taken; certificates of stock were actually printed; no certificates were actually issued. The substantial indebtedness of the corporation consisted only of moneys due to James Smith, Jr., in the account carried in the name of J. H. Halsey & Smith. The corporation and its officers recognized the stock as issued, the treasurer so testified. In March, 1914, he made a return for purposes of taxation to the state, reporting the capital stock outstanding as $500,000. This also was the understanding of James Smith, Jr. It appears that he, as president, together with the treasurer, made an income tax return to the federal government, stating the stock outstanding at $500,000. At a meeting, December 28th, 1914, the board of directors declared it advisable to further increase the capital stock from $500,000 to $1,300,000. At this meeting James Smith, Jr., was present. The resolution of increase provided that, as soon as it had been increased the president and treasurer of the company should be authorized to issue and sell such additional stock, or any part thereof, and

"also to use such additional stock or any part thereof, in satisfaction or liquidation of any part of the present indebtedness of the company at not less than the par value of such additional stock so used, provided the stockholders should unanimously approve and ratify such sale or use of such additional stock by their approval or ratification of the resolution."

At a meeting of the stockholders, December 31st, 1914, James Smith, Jr., was present; he called attention to the fact that the company was largely indebted for money loaned to it and on open account, and that it was desirable to take care of said loans and open account, and also stated that $800,000 of said loans and open account could be canceled and discharged by the issuance of new stock of the company for like amount therefor. The minutes state that after a full discussion of the matter it was deemed advisable by all the stockholders for the purpose of procuring the cancellation and discharge of $800,000 of the company's debts for moneys loaned to it and upon open accounts that the capital stock should be increased from $500,000 to $1,300,000. The resolution of the directors was ratified and approved. The steps necessary to effect the increase were duly taken; the certificates were changed so as to indicate that the capital stock was $1,300,000. The action of James Smith, Jr., on December 31st, 1914, clearly indicates to my mind that he considered that the amount of the increase from $100,000 to $500,000 had been issued, and that the indebtedness had been reduced by that amount, and that he, or someone for him, was the owner of the stock. No certificates representing the increase from $500,000 to $1,300,000 were ever in fact issued. It is clear that the intent was to use the increase for the reduction of the debt due to James Smith, Jr., standing upon the books as J. H. Halsey & Smith; the items and the interest had been carefully calculated for the purpose of liquidating the account. The return made to the state March 4th, 1916, for the purpose of taxation states the outstanding capital stock as $1,300,000. The treasurer testifies that the only reason for not issuing the certificates representing either increase was that James Smith, Jr., asked him to delay it until he should receive definite advice as to how it should be issued; that he received this instruction at the meetings at which the increases were authorized; he testi-

fied that "it was said, and I think once by James Smith, Jr., it was uncertain how to issue it; he couldn't make up his mind how to issue it." He further testified that it was the purpose to convert the debt which appeared upon the books in the name of J. H. Halsey & Smith into stock. I think that when James Smith, Jr., stated that he was uncertain how to issue the stock he did not mean, as contended for by the Fidelity Trust Company as assignee of James Smith, Jr., that it was uncertain how much should be issued for cash and how much for indebtedness, but that it was uncertain as to whom to issue it, whether to J. H. Halsey & Smith, T. P. Howell & Company or James Smith, Jr., or some other nominee of James Smith, Jr. I think the circumstances and the evidence clearly demonstrate that it was not only the intent to issue these increases in partial liquidation of the J. H. Halsey & Smith account, but that it was conceded by all to be a completed transaction, the mechanical details alone being lacking. I think that the actions of James Smith, Jr., at the two meetings amounted to offers and the actions of the corporation to acceptance; that there was no credit given upon the books of the Newark Advertiser Company is of little significance, because there was no credit given for the difference represented by the increase in the bond issue. The explanation of failure to make entries upon the books is similar to the explanation of failure to actually issue the certificates. There was doubt as to how the account was to be carried, but, however carried, the increases were to be in liquidation of the J. H. Halsey & Smith or James Smith, Jr., account. James Smith, Jr., was in court during the trial of the case, and I think the circumstances and the testimony pointed so strongly to the result that I have reached that the burden was upon those asserting the contrary to call him if they desired to insist the contrary. To effectuate an issue of stock it is not necessary that a certificate issue. *American Pig Iron Storage Co.* v. *State Board of Assessors, 56 N. J. Law 389.* My conclusion, therefore, is, that to the extent of the difference between the amount necessary to liquidate the $100,000 prior bond issue and the $500,000 authorized bond issue, there must be a credit on the J. H. Halsey & Smith or James Smith, Jr., account, and to the extent of the

difference between the capital stock of $100,000 and $1,300,000 there must be a like credit. If this does not ˜entirely liquidate the J. H. Halsey & Smith or James Smith, Jr., account, there must be a reference to a master. Of course, if there was on December 31st, 1914, less due upon the J. H. Halsey & Smith account than enough to make necessary the use of all of these increases to liquidate it, only so much as necessary may be used, and any indebtedness created after December 31st, 1914, is not affected in any manner.

*Third.* Is the holder of the James Smith, Jr., account estopped from taking advantage of the improper record of the mortgage securing the bonds?

I have already adverted to the authorization of the mortgage which covered all of the property of the Newark Advertiser Company to secure the issue of bonds to the extent of $500,-000. The mortgage, although dated on June 1st, 1912, and acknowledged upon June 25th, 1912, was not recorded until April 11th, 1913, nor were any bonds issued under it until that date, at which time all of the bonds, $500,000 in amount, were issued to James Smith, Jr.; some of them were at various times negotiated by him, and they are now held as follows: $135,000 by his assignee, $200,000 by the Federal Trust Company, $50,000 by the Mechanics and Metals National Bank, $100,000 by Edward H. Hatch, $15,000 by the American National Bank, all except those held by his assignee pledged to secure indebtedness owing by James Smith, Jr. The mortgage was recorded as a real estate mortgage; the funds in the hands of the receiver of the Newark Advertiser Company is the proceeds of chattels, and the mortgage therefore is void as against creditors. The bondholders and the Federal Trust Company, as trustee, insist that James Smith, Jr., and his assignee are estopped to set up the invalidity of the mortgage as against his claim. The receiver of J. H. Halsey & Smith and the assignee of James Smith, Jr., insist the contrary. Counsel for the assignee of James Smith, Jr., rely upon the proposition that when James Smith, Jr., negotiated the bonds, he warranted but four things under the Negotiable Instrument act (*Comp. Stat. p. 3742 ¶ 65*)—*first,* that the instrument was genuine and in all respects what it

purported to be; *second,* that he had good title to it; *third,* that all prior parties had capacity to contract; *fourth,* that he had no knowledge of any fact which would impair the validity of the instrument or render it valueless. The answer is that all these warranties enter into the negotiation of any negotiable instrument, yet there is nothing which will prevent further warranties or the operation of an equitable estoppel. The bonds upon their face clearly indicates that they were intended to be secured by a mortgage which would be effective as against general creditors; both parties dealt with the securities upon this assumption; the mistake was not a mistake of law but one of fact, mutual to both. *Big. Est. (6th ed.) 491,* says:

"One class of cases (of estoppel) is designated in this book as Estoppel by Contract, a term which is intended to embrace (1) all cases in which there is an actual or virtual undertaking to treat a fact as settled, so that it must stand specifically as agreed."

See, also, *p. 495.* As between the mortgagor and the mortgagee the mortgage is valid. James Smith, Jr., is not only a creditor of the corporation, but he is the sole stockholder. He cannot, now, simply because his interest has changed, nor can his assignee take a position inconsistent with that previously assumed, to the prejudice of his pledgees. *11 Am. & Eng. Encycl. L., tit. "Estoppel," 446; Daniels* v. *Tearney, 102 U. S. 422.* Nor do I think that there is any distinction between the debt incurred to Smith after the negotiation of the bonds and that which had been incurred before; both parties continued to deal upon the assumption that the mortgage was a valid security. I conclude, therefore, that the assignee of James Smith, Jr., is estopped from asserting the invalidity of the mortgage.

As to the method in which the equities of the parties should be worked out, in view of this estoppel, I am inclined to agree with Mr. Hood. The debts of the corporation, excluding those due to James Smith, Jr., should be ascertained. The bondholders will then be entitled to that proportion of the fund in court as their debt bears to the whole debt. There then should be figured all the debts of the corporation allowed, including bondholders and general claims. The general creditors, other than the Smith claim, will be entitled to that proportion of the

amount in court as the amount of their claims bears to all the claims of the corporation, and the Smith claim will be entitled to .the balance.

Decree may be settled on notice.